## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT DELAWARE

| | |
|---|---|
| MICHAEL EICHLER, and all other similarly situated individuals, | Case No.: |
| Plaintiff, | **CIVIL ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| VBIT TECHNOLOGIES CORP., VBIT MINING LLC, ADVANCED MINING GROUP, DANH CONG VO a/k/a DON VO, PHUONG D VO a/k/a KATIE VO, SEAN TU, JIN GAO, and JOHN DOE INDIVIDUALS 1-10, and ABC COMPANIES 1-10, | |
| Defendants, | |

## CLASS ACTION COMPLAINT

Plaintiff, Michael Eichler, ("Plaintiff"), on behalf of himself and all others similarly situated, bring this class action against VBit Technologies Corp. ("VBit Tech"), VBit Mining LLC ("VBit Mining"), Advanced Mining Group ("Advanced Mining"), Dahn Vo a/k/a Don Cong Vo, Phuong D Vo a/k/a Katie Vo, Sean Tu, and Jin Gao ("Defendants"). Plaintiff seeks to recover treble damages he and members of the Class incurred as a result of Defendants' violations of 18 U.S.C. § 1962(c) and (d), as well as other common law and statutory violations, as part of Defendants' illegal Bitcoin mining Ponzi scheme, and in support thereof avers:

### NATURE OF THE ACTION

1.      This action features an association-in-fact RICO enterprise constituted by several individuals and corporate entities that conducted and conspired to conduct their affairs through a

fraudulent Bitcoin mining scheme. That scheme promised the sales, leasing, and servicing of specialized computer hardware to produce Bitcoins for customers, but in reality functioned as a massive Ponzi scheme that paid out the promised Bitcoins only as long as new victims provided additional funds to do so.

2.      Bitcoin mining is a process that requires powerful computers and significant electrical power. As compensation for performing the resource-intensive computing work necessary to verify the transactions on Bitcoin's blockchain, Bitcoin "miners" receive Bitcoin.

3.      By design, only 21 million Bitcoins will ever be created, and more than 19 million Bitcoins have already been mined. This limited supply drives a fear of missing out on a lucrative business opportunity.

4.      Cryptocurrency prices are volatile because they are highly susceptible to fluctuating demand, changing government regulations, and social media hype. At one time, Bitcoin saw a meteoric rise in value. Bitcoin traded at $.09 per Bitcoin in 2010 and reached a high of $68,789 in November 2021. Since then, the price of one Bitcoin has ranged from its high of $68,789 in November of 2021 to approximately $16,907 as of the filing of this Complaint.

5.      While in years past a standard home computer could successfully mine Bitcoin, the computing power necessary to mine has expanded greatly as the verification process has evolved. Today, most Bitcoin mining takes place in large "data centers" that store and power vast computer servers that do the mining.

6.      These data centers generally operate where electricity is inexpensive and in colder climates so that additional energy is not required to cool the computer hardware.

7.      Although cryptocurrency mining has been profitable for some individuals, it has also provided a vehicle for opportunists to prey on cryptocurrency consumers. As alleged herein,

Defendants are just such opportunists. Defendants Danh Cong Vo, Phuong D Vo, Sean Tu, Jin Gao, VBit Tech, VBit Mining, and Advanced Mining directed the operation or management of the association-in-fact "Bitcoin Mining Fraud Enterprise" and conspired to recruit Plaintiff and the members of the Class (defined *infra* ¶ 180 to enter into contracts to purchase Bitcoin mining packages that Defendants promised would enable Plaintiff to mine Bitcoin.[1] By offering Plaintiff and the Class the chance to own mining packages, Defendants promised Plaintiff he could generate a steady stream of Bitcoin and, as such, obtain Bitcoin by purchasing the use and servicing of the machines needed to generate it without taking on the higher risks associated with trading Bitcoin by simply attempting to time the market.

8.    Defendants promised that through these mining packages, Plaintiff and the Class would lease (with the option to eventually purchase) computer hardware that was hosted in a facility maintained by Defendants, where the hardware would efficiently mine Bitcoin for Plaintiff and the Class. Over time, Plaintiff and the Class would accumulate Bitcoin, which is kept in what are referred to as "virtual wallets," and which could be (a) used to purchase additional mining packages from the Defendants, (b) held as an investment, (c) converted to U.S dollars (or other government issued currency), or (d) used to buy goods or services.

9.    Defendants further promised that Plaintiff could earn commissions and increase the computing power of their own mining packages if they recruited their friends and family to buy mining packages.

---

[1] Copies of Defendants' uniform "Payment and Hosting Agreement Contract" (the "Contract") are attached as Exhibit A & B. The promises made by Defendants are also encompassed in the FAQ on the Advanced Mining website (https://www.advancedmining.io/faqs/) (last visited Nov. 9, 2022), which explains in more detail the nature of the supposed hardware being purchased and the mechanisms for customers to receive their Bitcoins.

10.     Defendants' advertised offerings, however, were a complete sham, and Defendants have perpetrated a classic Ponzi scheme.

11.     Defendants did not actually lease and/or sell to Plaintiff and the Class the hardware they represented they controlled and hosted in their data centers. They sold and leased to Plaintiff and the Class far more computing power than they controlled. Defendants converted for their own benefit any Bitcoin mined from any hardware they purported to lease to Plaintiff and the Class.

12.     Defendants relied on funds from new victims to pay earlier victims. In other words, rather than generating new Bitcoins as promised, Defendants moved funds from more recent customers into the accounts of earlier-in-time customers to give the false appearance of a prosperous business.

13.     Defendants fueled their Ponzi scheme with multi-level marketing, which turned its customer base into a sales force that would recruit family, friends and colleagues to become new victims.

14.     Defendants incentivized their customer sales force with Bitcoin bonuses added to their virtual wallets and the lure of luxury vacations, boats, and sports cars for achieving recruiting goals.

15.     Defendants' scheme worked so long as they secured new customers and so long as the price of Bitcoin continued to rise.

16.     Defendants' fraudulently induced their customers to purchase products that did not exist. Further, Defendants developed a multi-level marketing scheme to create the income necessary to pay earlier customers. In so doing, Defendants utilized the internet, credit card wire transactions, ACH bank wire transactions, and the promise of interstate shipping services to

4

carry out their fraud. As such, Defendants' scheme constitutes the predicate RICO acts of mail and wire fraud under 18 U.S.C. §§ 1341, 1343.

17.     When the price of Bitcoin plummeted from a high of nearly $69,000 in November 2021 to almost half that, around $35,000, in January 2022, Defendants realized they could no longer sustain their house of cards.

18.     In order to conceal their original fraud and attempt to avoid responsibility for the impending collapse, Defendants on January 31, 2022 "sold" VBit Tech to Advanced Mining, a supposed "Asian-based company" with "global" cryptocurrency operations. However, there is no evidence that Advanced Mining existed prior to the "sale." (Nor is there evidence that Advanced Mining's announced CEO Lillian Zhao actually exists.) And as recently as October 18, 2022, Defendants sent an email to customers indicating that VBit Tech is merely doing business as Advanced Mining.

19.     Rather, the Advanced Mining "sale" was merely a ploy for Defendants to duck responsibility and permit them to continue victimizing customers before the inevitable collapse.

20.     By June 2022, the price of Bitcoin had fallen to below $20,000, and Defendants could no longer attract enough new customers to maintain the fraud.

21.     Defendants' solution was to (a) freeze their customers' virtual wallets, preventing customers from accessing the valuable Bitcoin they supposedly held, and (b) continue using the computer hardware they purportedly sold or leased to Plaintiff and the Class for Defendants' own benefit.

22.     Defendants' association-in-fact "Bitcoin Mining Fraud Enterprise" continues to operate. As of the filing of the Complaint, Defendants' website remains operational. And as

recently as October 18, 2022, Defendants sent an email purporting to update account login and online help desk features.

23.     Plaintiff seeks to recover the money and Bitcoin that they and the Class paid to Defendants, all Bitcoin currently held by Defendants and belonging to Plaintiff and the Class, punitive damages, attorneys' fees, and the costs of this action.

## JURISDICTION AND VENUE

24.     Plaintiff brings this action pursuant to RICO, 18 U.S.C. § 1964(c), which confers jurisdiction upon this Court over the subject matter of this action. The Court also has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

25.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Class exceeds 100; and many members of the proposed Class are citizens of different states than the Defendants.

26.     Venue is proper in this District under 28 U.S.C.A. § 1391 because the Contract entered into by the parties require that venue be located in this District.

27.     Defendants engaged in interstate commerce to advance their fraudulent RICO enterprise.

## THE PARTIES

### *Plaintiff*

28.     Plaintiff, Michael Eichler, is an adult with an address located at 1711 South 20th Street, Philadelphia, PA 19145. Plaintiff Eichler purchased a Bitcoin mining package from Defendants during the Class Period (defined *infra* ¶ 18081).

### *Entity Defendants*

29.     Defendant VBit Mining is a Delaware limited liability company with a principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

30.     According to Defendants, VBit Mining is a direct subsidiary of VBit Tech.

31.     Defendant VBit Tech is a Delaware corporation with a principal place of business located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

32.     Defendant Advanced Mining holds itself out as "a Philadelphia based tech start-up specializing in selling Bitcoin mining hardware and offering mining equipment hosting at very competitive prices to help bring Cryptocurrency access to the mainstream." Frequently Asked Questions, https://www.advancedmining.io/faqs/ (last visited Oct. 18, 2022).

33.     According to Defendants, Advanced Mining is located at 1625 Washington Avenue, Philadelphia, Pennsylvania 19146.

34.     According to Defendants, VBit Tech is a direct subsidiary of Advanced Mining.

35.     "Entity Defendants" refers to VBit Mining, VBit Tech, and Advanced Mining.

### *Individual Defendants*

36.     Defendant Danh Cong Vo is an adult who, upon information and belief, resides at 1823 S. Dover Street, Philadelphia, Pennsylvania 19145.

7

37.     Mr. Vo was the Chief Executive Officer of VBit Tech and VBit Mining until in or about January 2022.

38.     Defendant Phuong D Vo is an adult who is married to Mr. Vo and resides at 919 N. Front Street, Apt. F., Philadelphia, Pennsylvania 19123.

39.     Mrs. Vo has been touted as an integral part of VBit's formation and development.

40.     Defendant Sean Tu is an individual who, upon information and belief, resides at 1390 Braun Court, Eagan, Minnesota 55123.

41.     Mr. Tu is the former Chief Technology Officer of VBit Tech and VBit Mining, and present Chief Operating Officer of Advanced Mining.

42.     Defendant Jin Gao is an individual who resides at 3213 Riseview Walk, #101, in Philadelphia, Pennsylvania 19125.

43.     Mr. Gao holds himself out as the Vice Chairman of Advanced Mining and previously held the position of Vice President of VBit. Upon information and belief, Mr. Gao was also a co-founder of VBit.

44.     "Individual Defendants" refers to Mr. Vo, Mrs. Vo, Mr. Tu, and Mr. Gao.

45.     Plaintiff anticipates that discovery will reveal additional individuals and entities either operated and managed the enterprise and/or participated in the conspiracy to violate §1962(c).

## FACTUAL ALLEGATIONS

### A.     Definitions

46.     Cryptocurrencies: Digital assets that operate on computer networks where computers run copies of the same program. While the computers are linked to one another, no one computer controls the network, and no government or central bank backs the currency.

Because no computer controls the network, it is referred to as a "decentralized" network. The computer networks operate to (i) process cryptocurrency transactions and (ii) to maintain the database that records and stores the transactions.

47.     Blocks: As used herein, sets of cryptocurrency transactions that are grouped together to form a block.

48.     Blockchain: As used herein, a ledger of all the blocks that comprise a particular cryptocurrency and serves as a long running receipt containing every transaction ever recorded on that cryptocurrency.

49.     Bitcoin: The most popular cryptocurrency and the cryptocurrency at issue in this case.

50.     Bitcoin Mining: A process that involves networks of computers that work to solve complicated math problems. The purposes of solving the math problem are to verify that Bitcoin transactions are legitimate and to add new blocks to the blockchain. In return for contributing their processing power, the owners of the Bitcoin mining computers on the network are rewarded with new Bitcoins.

51.     Virtual wallet: A digital application (commonly referred to as an "app") or other software used for storing and protecting confidential information that gives a customer control over his or her cryptocurrency.

52.     Mining Packages: As used herein, the products sold by Defendants. Mining packages include (a) a lease on computer hardware (with an option to purchase at the end of the lease) used to mine Bitcoin, and (b) hosting services that power the hardware and connect it to a network.

53.    Hashrate Power: The measure of computing power that determines how quickly a computer can mine cryptocurrency.

54.    Multi-Level Marketing: The practice of selling goods or services on behalf of a company whereby the members of the sales force receive commissions on their sales as well as the sales of any participants they recruit.

**B.    Cryptocurrencies, Bitcoin, and Mining**

55.    Bitcoin is the world's first and most popular cryptocurrency.

56.    Bitcoin relies on a blockchain technology to process Bitcoin transactions. By utilizing the blockchain, Bitcoin serves as an alternative to more traditional, government-backed currencies.

57.    Bitcoin relies on significant computer processing power to keep track of all its transactions and to maintain the blockchain.

58.    The blocks are verified through a process in which Bitcoin miners race to solve a complicated math problem.

59.    The first miner to solve the problem can update the block on the blockchain and is then rewarded with a set amount of Bitcoin.

60.    Bitcoin was designed so that the miners are rewarded with new Bitcoins for their work in maintaining the blockchain.

61.    The result is that maintaining a Bitcoin mine keeps Bitcoin running while also turning a profit for the owner.

62.    In the early days of Bitcoin, from 2009-2012, Bitcoin miners could mine from their personal desktop computers, but that is no longer the case.

10

63.     It is estimated that between 2011 and 2018, the amount of computing power used in mining Bitcoin increased by a factor of 100 million.

64.     As the number of miners increased so did the competition, and miners with greater computing power (i.e., hashrate) have better odds of solving the math problems and reaping the Bitcoin rewards.

65.     Today, the computing hardware necessary to mine Bitcoin can cost tens of thousands of dollars and the electricity needed to operate the computer terminals can be exorbitant, potentially exceeding the value of any mined Bitcoin.

66.     Given the hardware and electricity costs, Bitcoin miners have worked collectively in mining enterprises, which offer customers the ability to participate in Bitcoin mining and buy or lease the necessary computer power and hardware.

67.     With Bitcoin's (and other cryptocurrencies') growth in popularity has come an opportunity for fraudsters like Defendants to take advantage of customers looking to get a toehold in cryptocurrency.

68.     Thousands of customers have already been duped into cryptocurrency-related frauds including, as here, Ponzi schemes.[2]

**C.     VBit, Advanced Mining, and Their Known Principals**

69.     Mr. Vo started VBit Tech and VBit Mining (collectively, "VBit") in 2018 and lured customers with promises that they could mine Bitcoin like large institutional miners who run gigantic servers dedicated to Bitcoin mining and operate where electricity is inexpensive.

---

[2] Michelle Singletary, *Six Signs Crypto Investment is a Classic Ponzi Scheme*, The Washington Post (May 18, 2022) https://www.washingtonpost.com/business/2022/05/18/fbi-eminifx-crypto-pyramid-scam/.

70.     Mr. Vo distinguished VBit with the claim he could give average people a chance to participate in what appeared to be a gold rush without all the risk associated with investing in a highly volatile cryptocurrency such as Bitcoin.

71.     VBit offered two primary products and services: (a) computer hardware, or "hashboards" specialized for Bitcoin mining, and (b) so-called "hosting" services, which would enable customers to mine Bitcoin with little or no effort.

72.     VBit advertised on its website, "[y]ou don't need to do anything regarding the setup or maintenance of your hardware. We take care of logistics, installing and updating software, providing affordable electricity, and keeping your equipment cool and in working order." Mining Shop, vbitmining.com/mining-shop/, Sept. 19, 2021, Internet Archive, https://web.archive.org/web/20210919232007/https://www.vbitmining.com/mining-shop/ (last visited Nov. 8, 2022).

73.     Through marketing and advertising, VBit represented to Plaintiff and the Class that it "operate[s] some of the largest and most efficient mining facilities in the world, with unprecedented access to clean, cheap power and expert staff." Vbitmining.com, Dec. 24, 2021, Internet Archive, https://web.archive.org/web/20211224100044/https://www.vbitmining.com/ (last visited Nov. 8, 2022).

74.     Thus, VBit advertised that it would host its customers' individualized computer hardware in its data centers and that its customers would control the extent of their participation in the mining of Bitcoin, and in exchange the customers would be responsible for "hosting" costs.

75.     VBit sold several mining packages, some of which included a set period of hosting with the upfront price of the package, while others required a down payment followed by monthly hosting charges.

76.     Though VBit's ownership and operational structure is murky, upon information and belief, Mr. Vo co-founded VBit with Mr. Gao and was VBit's Chief Executive Officer from its founding in 2018 through January 2022.

77.     Advanced Mining, which now purportedly owns VBit, similarly claims on its website that it can provide customers the opportunity to purchase their personal Bitcoin mining equipment with "custom designed data centers," the "cheapest electricity rates," and "efficient mining systems." Why Advanced Mining, https://www.advancedmining.io/how-mining-works/ (last visited Nov. 8, 2022).

78.     Advanced Mining's website further advertises that Bitcoin mining previously required "a huge amount of know-how, but now anyone can leverage [Advanced Mining's] experts' skills relieving you of setup and maintenance, so you can focus on the more important things to ensure a profitable operation." *Id.* Advanced Mining advertises that it is "Highly Proven & Trusted. Built by technology and financial experts, our US-based operations are designed for clients who seek a reliable partner. Our customer support is staffed by proven mining specialists. Any questions or concerns? Just call or write!" *Id.*

79.     Mr. Tu was VBit's Chief Technology Officer, and presently serves as the Chief Operating Officer of Advanced Mining. According to Mr. Tu's LinkedIn profile, Mr. Tu sought to provide VBit customers with "the technology, infrastructure, services and support that enables them to be successful miners and achieve their financial goals."

80.     Upon information and belief, Mr. Gao is a co-founder of VBit, once held the title Vice President of VBit, and presently serves as Advanced Mining's "Vice Chairman."

81.     Mr. Gao had an active role in promoting VBit.

82.     Mrs. Vo is credited with inspiring Mr. Vo to launch VBit. She was a leader in the organization, and in a speech given at a 2019 gala to celebrate VBit's first year referred to VBit as her "child."

**D.     VBit's "Hosting" Contracts with Plaintiff**

83.     Plaintiff and the Class members entered into Contracts with VBit and Advanced Mining. The Contracts were drafted by Defendants, are uniform and apply consistently to Plaintiff and all Class members.

84.     Defendants also made promises about the nature of the products and services provided by the Contracts on their website's FAQ section.

85.     Defendants offer and currently advertise different mining packages ranging from "Silver" on the low end (purportedly 33,333 in giga hash per second power ("GH/s") for $2,443) to "Black Diamond" on the high end (purportedly 800,000 GH/s for $58,619).[3]

86.     On October 18, 2021, Plaintiff entered into his first Contract with VBit Mining to lease ("with a buyout option") and for VBit Mining to host a Gold Package that would provide "computer server hashboards with an average of 66,667 GH/s computer computational power" and one year of hosting. Exhibit A.

---

[3] Prices for Defendants' mining packages have fluctuated over time and generally have moved up and down with the price of Bitcoin. The significant drop in the price of Bitcoin during 2022 may explain why the current advertised price of a Black Diamond package is lower than the prices that the Plaintiff paid for his mining package set forth below.

87.     Mr. Eichler made one payment of $9,860 for this contract.

88.     On December 14, 2021, Plaintiff entered into his second Contract with VBit Mining to lease ("with a buyout option") and for VBit Mining to host a Platinum Package that would provide "computer server hashboards with an average 100,000 GH/s computer computational power" and one year of hosting. Exhibit B.

89.     Mr. Eichler made one payment of $15,548 for this contract.

90.     Under the Contracts, VBit and Advanced Mining represented that they would be utilizing individualized mining equipment for the benefit of Plaintiff and the Class:

> The first monthly payment will be due 30 days after the first day **your equipment is installed and actively running**.

Exs. A & B at 1 (emphasis added).

> **Service.**
>
> 1.1 Facility. Service provider will provide server hosting facility, electrical power, and Internet access to Customer at Service Provider's and partner facilities (the "Facility") for the purpose of **installing, maintaining and operating Customer's leased or owned servers** and ASIC chips (the "Equipment"), which may be updated from time to time to add or delete Equipment with written notification to the Customer.

*Id.* at 3 (emphasis added).

91.     The FAQ on Defendants' website emphasizes the physical and customer-specific nature of the hardware being purchased:

> **Is Advanced Mining a cloud mining company?**
>
> No, Advanced Mining is a hardware reseller offering hosting services. The consumer purchases actual ASIC hardware and NOT a cloud mining contract. Customers can choose to utilize our superior hosting services or have their hardware shipped to them, subject to shipping and handling charges. Please refer to our Terms and Conditions for details.

15

92.     Under the Contracts, Plaintiff leased Bitcoin mining equipment from VBit/Advanced Mining, but he also had the option to purchase the equipment for $1, plus shipping and handling fees:

> **Use and leasing rights with a buyout option to:**
>
> Customer can execute buyout option on Equipment referenced above at any time by submitting a written request of buyout execution and shipment of said equipment. Upon such request, Customer shall pay the shipping and handling fee described in Section 2.1 of this agreement in additional to a $1.00 USD buyout and the balance of all payments described above.

*Id.* at 1, 2 (emphasis in original).

93.     Under the Contracts, Defendants had total control over Plaintiff's equipment. *See id.* at § 6 (titled "Removals and Relocation of Equipment").

94.     As part of the Contracts, Defendants promised to host the equipment purchased by Plaintiff and Class members. The website FAQ explains that "our hosting services include regular maintenance and cleaning by dedicated staff at our data centers." The website FAQ also encourages customers to utilize the hosting services by explaining the economies of scale related to operating such Bitcoin mining hardware:

> **Why should I host my miners with AM instead of my own facility?**
>
> Bitcoin mining computer hardware requires technical knowledge to setup, a well ventilated space and huge amounts of ongoing electricity at a high voltage to operate. You will incur very high fees to set-up the space and high ongoing electricity bills to operate, not to mention the loud noise these computers generate. So just let us worry about setting it up and maintaining it for you while you decide on where to distribute your hashpower and collect your rewards!

Advanced Mining FAQ: Hardware and Hosting, https://www.advancedmining.io/faqs/ (last visited Nov. 8, 2022)

16

95.     The website FAQ is also where Defendants explain how customers should have been able to account for the Bitcoins that were supposedly being mined on their leased or purchased hardware hosted by the Defendants:

> **How do I know what I'm really mining?**
>
> With the amount of hash-power that you received when you purchase your mining package, you will be able to use any number of public calculators that you are able to find on Google and plug in the amount of hash-power in the mining calculator of your choice. The calculator will let you know the amount of Bitcoin you should be mining per day.

Advanced Mining FAQ: General, https://www.advancedmining.io/faqs/ (last visited Nov. 8, 2022)

96.     The website FAQ also explained how customers would be able to access the Bitcoins that were supposedly being mined on their equipment:

> **How will I receive my profits and where will be stored?**
>
> All mined Bitcoins are distributed directly into your AM Wallet.

*Id.*

**E.     Like All Ponzi Schemes, VBit Depends on a Steady Supply of New Victims to Sustain the Business**

97.     VBit successfully grew its base to approximately 15,000 customers worldwide as of June 2022.

98.     VBit achieved this rapid growth by using multi-level marketing, turning its customers into a sales force, and incentivizing them to recruit new VBit customers.

99.     VBit recruited customers to promote its products by using word of mouth and to simplify the complexities of cryptocurrency and the blockchain. VBit referred to its customer recruiters as "affiliates."

17

100.    Some affiliates and VBit employees hosted Zoom sessions where they touted the virtues of VBit and shared stories of their own success with the company.

101.    VBit advertised that one could become an affiliate and earn commissions even if she or he were not currently a VBit customer.

102.    VBit employees posted videos on YouTube about how to recruit affiliates to increase the hardware and computing power available to customers to increase their mining payouts. *See e.g.* VBit Tech Team PH – Compensation Plan, https://www.youtube.com/watch?v=BPPCT_KkjUs (last visited Nov. 8, 2022).

103.    When VBit affiliates recruited new VBit customers "under them," the recruiting affiliate received a referral commission in cash or Bitcoin and, according to Defendants, could receive a "boosted hashrate" on his own machines.

104.    The "boosted hashrate" purportedly would increase a customer's mining power. For example, if a customer leased a Black Diamond package 800,000 GG/s power and earned a "boosted hashrate" of 100,000 GG/s, the customer would then have the power to mine with 900,000 GG/s in hashrate power. This means that the customer could mine Bitcoin more than 10% faster than previously.

105.    VBit employees, executives, and affiliates, including Defendant Gao, National Leader Skip McCoy, and Business Partner Gersham Fulcott posted videos online as a means of recruiting VBit customers.

106.    Additionally, Defendants told VBit customers they could receive large bonuses for reaching a certain affiliate rank when they hit certain customer recruitment benchmarks.

107.    For example, Messrs. Vo and Gao presented top performers with new BMW sports cars and shared videos of the presentation.

18

108.    An October 3, 2020 YouTube video posted by Mr. Fulcott explains all the various types of compensation that VBit customers were told they could earn by recruiting friends, family, and colleagues to become VBit customers. *See* VBit Tech Team PH – Compensation Plan, https://www.youtube.com/watch?v=BPPCT_KkjUs (last visited Nov. 8, 2022).

109.    Customers were also told they would earn cash commissions based on the price the recruited customer paid for a mining package. VBit customers that sold mining packages to their own contacts were told they would receive a cash commission of 6% from sales to their direct recruits and commissions ranging from .75%-4.5% for sales made by recruits further down the chain, up to six levels down. The YouTube screenshot below shows the different referral commissions available:



110.    In addition to cash bonuses tied to the amount of a sale, Defendants told VBit customers who sold mining packages to their own contacts that they would receive 10% of that package's hashrate as a bonus on top of that customer's existing hashrate.

19

111.    Mr. Fulcott represented that, "[i]f you personally (level 1) sold a package that has 10,000 GH/s, you will receive 1,000 GH/s to your mining account and make more Bitcoin everyday!" The YouTube screenshot below shows the different hashrate bonuses available:



112.    Just like the cash bonuses, Defendants told customers they could also receive hashrate bonuses not only for those customers who they personally recruited, but also from customers up to "seven levels" down the chain of recruitment.

113.    In keeping with Defendants' Ponzi, scheme, the result of these hashrate bonuses was that every time a VBit affiliate customer recruited another customer, VBit would sell the new customer its contracted package and would also provide the recruiting affiliates up the sales chain with additional hashrate computing power for one year.

114.    According to the slide in Mr. Fulcott's presentation, if an affiliate customer with "Vice Chairman" status recruited a new customer, VBit represented it would give seven levels of affiliate customers hashrate bonuses tied to that new purchase.

115.    The result was that VBit promised to deliver a total of 30% in hashrate bonuses for sales of mining packages made under an affiliate that was a Vice Chairman.

116.    For example, if a new customer purchased a package with a hashrate of 100,000 GH/s and there was a sufficient network of "affiliates" with a Vice Chairman at the top of the web of affiliates, VBit would then promise to deliver an additional 30,000 GH/s in hashrate power to the affiliates above the new customer.

117.    VBit also offered an incentive program called the "Infinity Team," which provided recruitment incentives based on a customer's total sales volume from all customers that he or she recruited or that were recruited under him.

118.    The "Infinity Team" cash bonuses started at $100 for $5,000 in sales.

119.    According to Defendants, once a VBit affiliate brought in $500,000 in sales volume he or she would receive $5,000 to use on a shopping spree (or $2,000 worth of Bitcoin).

120.    As shown in the YouTube screenshot below, the stated purpose of providing shopping money was to encourage affiliates to buy luxury clothes that would serve as conversation starters and encourage friends and family to ask how the affiliate could afford a new watch or designer shoes:



121.    And as shown in the YouTube screenshot below, Defendants represented that once an affiliate brought in $1,000,000 in sales, VBit would pay for the affiliate to go on a luxury vacation valued at $10,000:



122.    As shown in the YouTube screenshot below, Defendants represented that once an affiliate brought in $3,000,000 in sales, VBit would pay for the affiliate to receive a new BMW (or $20,000 in Bitcoin):



123.    Defendants further represented that, once an affiliate brought in $30,000,000 in sales, VBit would pay for the affiliate to receive a "motor vehicle," which is described as "anything with an engine" (including a boat or plane), worth up to $350,000 (or $150,000 in Bitcoin).

124.    As shown in the YouTube screenshot below, Defendants represented that once an affiliate brought in $200,000,000 in sales, VBit would buy the affiliate a new house worth up to $1.5 million, plus $100,000 in Bitcoin:



**F.  VBit Lured Plaintiff and Thousands of Other Customers**

125.    In forming VBit, Mr. Vo specifically targeted consumers who were not tech savvy, but who wanted to cash in on the excitement surrounding Bitcoin.

126.    One such consumer was Mayama Kesselly who learned about VBit from a co-worker who pitched her on purchasing VBit's services. Investors Fear Millions Lost in Pennsylvania's Largest Cryptocurrency Scandal, https://www.post-gazette.com/news/state/2022/09/07/pennsylvania-cryptocurrency-failure-investors-bitcoin-vbit-advanced-mining-group/stories/202209070094 (Sept. 7, 2022).

127.    Ms. Kesselly took out $50,000 in loans to make her purchase and purchased the "Black Diamond" mining package.

128.    Ms. Kesselly soon became a VBit "evangelist" and recruited her friends to also purchase VBit mining packages, and Ms. Kesselly spent her returns on additional packages.

129.     Mr. Vo and the other Defendants successfully pitched VBit as an easy way to generate Bitcoin and to become wealthy.

130.     In one YouTube video, Mr. Vo claimed:

> I want to help you and as many people as possible become financially free, become rich. Fact is it doesn't matter where you're from or how old you are. I grew up in the South Bronx and I became a self-made millionaire at 15 years old. All you need is the desire and the right opportunity.
>
> …
>
> There is now a technology that allows everyday folks like you to cash in on this trend and I have built a system so easy to use that anyone can use it to build their wealth. So, are you ready to transform your life?

VBit Tech Team PH - CEO of VBit Technologies - Learn To Succeed by Danh Vo

https://www.youtube.com/watch?v=Rjlm13ACuDU (last visited Oct. 18, 2022).

**G.     VBit Executives and Other Employees Flaunted VBit's Illusory Success.**

131.     As Bitcoin's value continued to grow between 2018 and 2021, Defendants and VBit's other employees regularly boasted on social media about VBit's purported success.

132.     On July 30, 2021, Mr. Vo posted the following picture of himself on Instagram with the caption: "Bought 20 [bitcoin] at $29.5k before I left for vacation a week ago," accompanied by a photo of him on a yacht. "Now a happy camper while I sit on a private yacht."





**Bitcoin Miner US**
@BTCminingUS

Bought 20 BTC at $29.5k before I left for vacation a week ago. Now a happy camper while I sit on a private yacht. #Bitcoin ₿

5:45 AM · Jul 30, 2021 · Twitter for Android

133.    As of the filing of this Complaint, the Bitcoin Mr. Vo purportedly purchased in July 2021 would have lost approximately $250,000 in value.

134.    As reported in a September 7, 2022 Pittsburgh Post-Gazette article, one customer reported seeing VBit employees living the high life with wine and liquor bottles worth thousands of dollars. *See* Investors Fear Millions Lost in Pennsylvania's Largest Cryptocurrency Scandal, https://www.post-gazette.com/news/state/2022/09/07/pennsylvania-cryptocurrency-failure-investors-bitcoin-vbit-advanced-mining-group/stories/202209070094 (Sept. 7, 2022).

135.    In September 2020, VBit posted the following picture of its Vice Chairman, Defendant Gao, wearing a VBit t-shirt and crouching next to a new $150,000 BMW sports car.

26



136.    The car has a "VBit1" license plate and VBit captioned the picture "A subtle yet

big flex. Congrats to our very own Vice Chairman, Jin Gao, on his new ride! Thank you for your

hard work and dedication! We're excited to see what's next!"

**H.    VBit Was Purportedly "Acquired" By Advanced Mining.**

137.    In late January 2022, VBit announced that it had been acquired by a company

called Advanced Mining for $105 million.

138.    On January 31, 2022, VBit issued a press release relating to the sale and identified

Advanced Mining "as an Asian-based company primarily focused on bitcoin mining . . . ." VBit

Technologies Acquired by Advanced Mining Group in a Huge $105M Deal,

https://www.globenewswire.com/en/news-release/2022/01/31/2376030/0/en/VBit-Technologies-

Acquired-by-Advanced-Mining-Group-in-a-Huge-105M-Deal.html (last visited Nov. 8, 2022).

139.    In the press release, VBit touts "Advanced Mining" as a company that has been

"thriving in the crypto mining sector since 2015 and operating 12 data centers dedicated to

bitcoin mining in Europe and Asia." *Id.*

27

140.    VBit also stated that it was operating 27,000 Antminer S19 series and S17 series[4] out of five data centers "spreading across the globe in the United States, Canada and Kazakhstan." *Id.*

141.    According to Defendants, on February 17, 2022, alleged Advanced Mining CEO Lillian Zhao sent an email to all VBit/Advanced Mining customers stating that Advanced Mining was growing by "acquiring successful crypto mining businesses across the globe."

142.    Her email further stated that, as of February 2022, Advanced Mining operated 12 data centers and expected to operate over 50, which would make it one of the three largest crypto mining companies in the world as measured by hashrate power.

143.    Ms. Zhao also claimed that Advanced Mining would increase the interest rate that customers earn by keeping their mined Bitcoin in their Advanced Mining virtual wallets. She claimed that Advanced Mining customers could earn "14% annual interest on all [Bitcoin] held in the [Advanced Mining] wallet – the highest interest rate paid on BTC [Bitcoin] in the market today!"

144.    Despite the information contained in the press release, Advanced Mining is not – nor has it ever been – registered to do business in any jurisdiction in the United States.

145.    Advanced Mining did not exist in any form until January 2022.

146.    If it exists at all, Advanced Mining is a complete sham and the alter ego and/or instrumentality of VBit Tech, VBit Mining, and the Individual Defendants.

---

[4] Antminer is a manufacturer of Bitcoin mining servers.

147.    Defendants admitted as much in an October 18, 2022 email from Advanced Mining to its customers, which says at the bottom of the email that VBit Tech. is merely doing business as Advanced Mining:

© Copyright, 2022,  VBit Technologies Corp Doing Business As Advanced Mining • 1625 Washington Ave, Philadelphia, PA 19146-2045
You're receiving this email because you subscribed to emails from Advanced Mining.

148.    If Advanced Mining is in fact a duly authorized legal entity, according to Defendants that entity assumed all obligations of VBit.

149.    According to Defendants, Advanced Mining conducts the same or substantially similar business that VBit conducted before VBit's purported acquisition.

150.    VBit and Advanced Mining have the same or substantially the same ownership.

151.    Shortly after the announcement of the Advanced Mining transaction, Mr. Vo posted on LinkedIn that due to his efforts in pushing himself to build VBit, he had neglected his health and therefore would step down as CEO. Mr. Vo's LinkedIn profile states that he is "Retired for now."

## I.    VBit Entered into a Consent Order with the Securities Division for the State of Washington

152.    On July 12, 2022, VBit entered into a Consent Order with the Securities Division for the State of Washington ("Washington Securities Division"), which concluded that VBit's "offer and/or sale of the combined Bitcoin mining hardware and service packages constitute the offer and/or sale of a security as defined by RCW 21.20.005(14) and (17)"; and "[VBit] has

violated RCW 21.20.140, because, as set forth in the Tentative Findings of Fact, it offered and/or sold securities for which no registration is on file with the Securities Administrator."[5]

153.    Pursuant to the Consent Order, VBit agreed to pay fines to the Washington Securities Division totaling $15,000.

154.    VBit also agreed "that for the $156,000 of Bitcoin mining packages sold to approximately 82 Washington residents . . . [VBit] shall refund each Washington resident the original price of their mining package, less the value of any Bitcoin mined using their package (calculated as of the date of entry of this order), in exchange for the mining package purchaser's release of any ownership rights to their mining hardware."

155.    The Consent Order ordered VBit to make the refund payments to Washington purchasers within 120 days of the Order.

156.    Despite VBit's claim that it was sold to Advanced Mining in January 2022, the July 2022 Consent Order made no mention of Advanced Mining, and Lillian Zhou appears on the signature line on behalf of VBit and is identified as its CEO.

157.    Upon information and belief, Lillian Zhou is not a real person but rather a fiction invented by Defendants as part of their fraudulent scheme.

**J.      "Advanced Mining" Defaulted on Plaintiff and the Class.**

158.    Beginning in May 2022, VBit/Advanced Mining customers experienced delays in withdrawing Bitcoin from their virtual wallets.

---

[5] Plaintiff posits that the mining packages and hosting services sold by Defendants are not securities under federal law. The definition of "security" under the Securities Act of Washington is broader than the definition of "security" under the Securities Act of 1933. *Compare* 15 U.S. Code § 77b(a)(1) *with* RCW 21.20.005(17).

159.    VBit/Advanced Mining described these delays as "batching" issues or technical glitches.

160.    On or around June 1, 2022, VBit/Advanced Mining stopped processing all withdrawals.

161.    Since approximately June 2022, Plaintiff's virtual wallet has been frozen and cannot withdraw Bitcoin or process any transactions.

162.    Plaintiff's so-called individualized "virtual wallet" are complete shams, i.e., they are merely numbers contained in a virtual database and not individualized units of Bitcoin associated with each Plaintiff and Class member.

163.    Contrary to their representations (*see* ¶ 92 *supra*), Defendants did not offer or maintain individualized, hardware-hosted mining services to Plaintiff and other customers. Rather, Defendants either were engaged in cloud mining, or a similar arrangement.

164.    Cloud mining is a form of cryptocurrency mining where participants in a "mining pool" rent a quantity of hashrate power and earn a pro-rata share of any profits based on the amount of hashrate power rented.

165.    It is referred to as cloud mining because, like other cloud-based computing, the equipment that is doing the mining is performed by a shared central server without active management by the user.

166.    Scammers have frequently used cloud mining schemes to dupe customers. Advanced Mining represented that the services it provides are not cloud mining because its customers actually own the hardware.

167.    Plaintiff never received the discrete, individualized mining equipment and services he paid for. Instead, Plaintiff's funds were misappropriated by Defendants, and the

Bitcoins appearing in Plaintiff's virtual wallet were in fact other victims' payments arbitrarily designated by Defendants as Plaintiff's generated Bitcoins in order to keep the fraudulent enterprise afloat.

168.    Defendants' fraudulent scheme unraveled when the market price of Bitcoin began to tumble in April 2022. It was only after the price of Bitcoin dropped precipitously that Plaintiff was, and continues to be, foreclosed from making withdrawals from his virtual wallet.

169.    Defendants' promises of huge commissions and increased payouts for money already spent in exchange for recruiting additional victims is the hallmark of a Ponzi scheme, and Defendants' entire business is a sham.

170.    Defendants sold far more computing power than they pooled, owned, or leased from third parties, and they presently owe Plaintiff and other customers amounts far in excess of what they were making on their mining operations.

171.    On June 27, 2022, Advanced Mining sent an email to its customers stating the following:

> Advanced Mining has positively impacted many lives during its few years in operation. Therefore, it saddens us to inform you that we can no longer service the United States market.
>
> Without over-disclosing, in summary, our team has worked diligently with multiple law firms to ensure that our products and services are not unregistered securities. However, the United States Securities and Exchange Commission (US SEC) disagrees; therefore, Advanced Mining must take measures to abide by US SEC and applicable laws. As a result, we stopped all sales and withdrawals because of a potential pending settlement with the US SEC. During this process, bitcoin mining for clients outside the US may continue normally. After completing our potential pending settlement with the US SEC, we look forward to resuming our global services to clients outside the US and other restricted countries.

172.    The email further states that U.S. customers "who earned more than what they originally paid to VBit/Advanced Mining will keep their earnings and must relinquish ownership of their mining hardware."

173.    The email further explained that "US customers who have not yet earned more than what they originally paid to VBit/Advanced Mining" had two options. They could either: (a) "[k]eep ownership of their hardware and have it shipped to them at their expense" with Advanced Mining refunding any unused prepaid hosting services, or (b) "[r]elinquish their hardware ownership to receive a full refund of all monies paid minus any commissions and mined bitcoins."

174.    Advanced Mining told its customers in the same email that they would be reaching out to customers to capture their choice of the two options.

175.    On July 5, 2022, Defendant Tu emailed Advanced Mining customers the following update:

- Advanced Mining would no longer be accepting payments;

- "all sales are "temporarily suspended";

- pending sales would be cancelled or refunded;

- "[n]o new commission and (commission bonuses) will be paid to any returned and cancelled sales";

- "[c]omission payout will temporarily be suspended until commissions are re-calculated based on canceled sales, returns, and refunds";

- "[a]ffiliate Membership for US residents (and US business entities) will be suspended this week (if not already);

- "We have finalized the WA state list of members; starting today (July 5th), we will begin reaching out to WA members on their options";

- "We are proactively working on a list of refunds for other states"; and

33

- "When we are done with WA customers, we will start with other states."

176. On June 27, 2022, Advanced Mining claimed to have closed its headquarters in Philadelphia, blaming the COVID-19 pandemic.

177. Yet Advanced Mining continues to offer various mining packages for sale on its website, but all packages are listed as "sold out." Advanced Mining, Mining Shop, https://www.advancedmining.io/mining-shop/ (last visited Nov. 9, 2022).

178. And as recently as October 18, 2022, Advanced Mining emailed its customers to inform them about upgrades to its online help desk system, refunds available to customers from the State of Washington who can take advantage of the consent order with its securities department, and fixes to login and account authentication. Despite Advanced Mining's earlier statements, the enterprise continues to function as a going concern to continue concealing the fraud.

179. As of the date of this Complaint, Plaintiff is unable to withdraw Bitcoin from his virtual wallet, despite Defendants' representations that Plaintiff could withdraw at any time all Bitcoin he owned.

## CLASS ACTION ALLEGATIONS

180. Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class ("Class") defined as:

> All persons or entities who, at any time up to the present ("Class Period"), entered into an agreement to purchase, acquire or lease Bitcoin mining equipment from Defendants. Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent, or employee of any Defendant, any co-conspirator and any governmental entity.

34

181.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are at least 15,000 Class members.

182.    Plaintiff's claims are typical of the claims of the other members of the Class. The Bitcoin Mining Fraud Enterprise was a complete sham. No one aware of the fraud would have participated in the scheme.

183.    Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of federal and state securities laws as alleged herein. The injuries and damages of each member of the Class were directly caused by Defendants' unlawful conduct.

184.    Plaintiff will fairly and adequately protect the interests of the members of the Class, has no interests that are adverse to the interests of the absent Class members, and has retained counsel who are competent and experienced in class action litigation.

185.    Common questions of law or fact exist as to all members of the Class, and they predominate over any questions affecting solely individual members of the Class. Among the questions of law or fact common to the Class are:

    a.    Whether Defendants offered to sell, or sold, Bitcoin mining packages by means of any untrue statement of material fact or any omission to state a material fact;

    b.    Whether Defendants directed the selling of Bitcoin mining packages by means of any untrue statement of material fact or any omission to state a material fact;

    c.    Whether Defendants used interstate wires to sell Bitcoin mining packages;

d.    Whether Defendants knew or were reckless or negligent in not knowing that representations regarding the nature of the equipment they sold and leased were false and misleading;

e.    Whether VBit Tech, VBit Mining, Advanced Mining, Danh Cong Vo, Phuong D Vo, Sean Tu, and Jin Gao function as an association-in-fact;

f.    Whether VBit Tech, VBit Mining, Advanced Mining, Danh Cong Vo, Phuong D Vo, Sean Tu, and Jin Gao knew about and conspired to participate in the scheme;

g.    Whether the computing hardware purportedly leased, serviced, and sold by Defendants actually existed;

h.    Whether the virtual wallets provided by Defendants actually held discrete Bitcoins or were instead sham internal ledgers;

i.    Whether the scheme functioned as a Ponzi scheme where earlier purchasers were paid out with the income directly derived from later purchasers;

j.    Whether the "sale" of VBit Tech to Advanced Mining was a sham transaction orchestrated to conceal the nature of the fraudulent enterprise;

k.    Whether the affiliate program was a legitimate, sustainable program or simply a means to bring in enough new income to sustain the Ponzi scheme;

l.    Whether Defendants breached the Contract with Plaintiff and the members of the Class; and

m.    The appropriate measure of damages sustained by Plaintiff and the other members of the Class as a result of Defendants' unlawful activities.

186.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records exist. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### RICO Participation - 18 U.S.C. §§ 1964(c), 1962(c)
### (Against All Defendants)

187.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

188.    Defendants VBit Tech, VBit Mining, Advanced Mining, Danh Cong Vo, Phuong D Vo, Sean Tu, and Jin Gao are an "enterprise" consisting of an "association-in-fact" as those terms are used in 18 U.S.C. § 1961(4) (the "Bitcoin Mining Fraud Enterprise").

189.    The purpose of the Bitcoin Mining Fraud Enterprise was to take payments from victims without providing the agreed upon services and to conceal this activity from consumers and regulators.

190.    Defendants had a direct business relationship with each other through their network of ownership interests and employment roles among the various Entity Defendants.

37

191.    The Bitcoin Mining Fraud Enterprise had longevity sufficient to permit Defendants to carry out the Enterprise's purpose, starting from its inception when the Entity Defendants were incorporated in 2018 and which they continue to carry out through a website and ongoing emails that give the false impression that the enterprise is a legitimate business.

192.    Each Defendant played a distinct role in the operation, management, and control of the enterprise through its pattern of racketeering activity. VBit Tech, VBit Mining, and, to the extent it exists, Advanced Mining interfaced directly with the victims and fraudulently used interstate wires to offer leases, services, and sales for Bitcoin mining hardware while in fact providing no such hardware or services to customers. Individual Defendants Danh Cong Vo, Phuong D Vo, Sean Tu, and Jin Gao were and are the founders, principals, and officers of these entities, and designed and executed the Bitcoin mining scheme through their control of the enterprise. They also designed and executed the multi-level marketing scheme to ensure a steady supply of new victims in order to maintain the enterprise by paying out earlier victims as if they were really getting the services bargained for. They also designed and executed the "sale" of VBit Tech to Advanced Mining in order to deceive customers and maintain the enterprise.

193.    The Entity Defendants and Individual Defendants are each a "person" as that term in used in 18 U.S.C. § 1961(3). Each participated in the operation, management, and control of the Bitcoin Mining Enterprise through a pattern of racketeering activity.

194.    All Defendants knew that their Bitcoin mining leases were fraudulent and that they were not actually supplying or servicing Bitcoin mining hardware on behalf of the victims.

195.    All Defendants knowingly and with intent to defraud took steps to advance the fraud and to conceal the fraud from consumers and regulators.

196.    Plaintiff and Class members were economically harmed by the racketeering conduct of Defendants' enterprise through the payments they made for fraudulent and illusory services.

197.    Plaintiff and Class members are entitled to treble damages and attorneys' fees and costs for this violation.

**COUNT II**
**RICO Conspiracy - 18 U.S.C. §§ 1964(c), 1962(d)**
**(Against All Defendants)**

198.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

199.    Defendants conspired to violate 18 U.S.C. § 1962(c) through the racketeering enterprise as set forth in paragraphs 187-197 in violation of 18 U.S.C. § 1962(d).

200.    Since VBit Tech was incorporated in 2018 and continuing to this day, the Defendants have conspired to violate 18 U.S.C. § 1962(d) through acts taken in furtherance of the "Bitcoin Mining Fraud Enterprise" with the knowledge that such acts were part of a pattern of racketeering activity to defraud consumers by falsely promising to lease them Bitcoin mining hardware and services and to carry out other frauds to continue and conceal the conspiracy.

201.    Acts undertaken by Defendants in furtherance of the conspiracy included:

a.    Making YouTube videos and social media posts that gave the false impression that purchasing hardware from Vbit/Advanced Mining would enable consumers to generate Bitcoin;

b.    Promoting the affiliate marketing scheme through internet videos and meetings that falsely promised additional mining capacity and "prizes" in order to generate more victims to conceal the nature of the ongoing fraud;

    c.    Engineering a sham transaction of the "sale" to Advanced Mining to conceal the true owners and operators of the enterprise;

    d.    Using the supposed foreign domicile of the sham purchaser to falsely justify withholding the rightful Bitcoins of Defendants' customers;

202.    Defendants knew or should have known about the fraudulent nature of the enterprise because Vbit and Advanced Mining never owned all the mining hardware they purported to lease, service and sell.

203.    Plaintiff and Class members were economically harmed by the racketeering conduct of Defendants' enterprise through the payments they made for fraudulent and illusory services.

204.    Plaintiff and Class members are entitled to treble damages and attorneys' fees and costs for this violation.

## COUNT III
### Common Law Fraud
### (Against All Defendants)

205.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

206.    As set forth more fully herein, Defendants made the following materially false representations or material omissions to Plaintiff (collectively, the "Misrepresentations"): (a) VBit is a legitimate business and not an illegal Ponzi scheme and complete sham operation; (b) Defendants would not utilize Bitcoin mined by Plaintiff for their own use and benefit; (c) Defendants were duly authorized to offer the mining equipment and hosting services as specifically detailed in the Contract; (d) Defendants were offering and maintaining individualized, hardware-hosted mining services, where in reality Plaintiff's computing power

was pooled together with others and was unrelated to the physical products and service being sold; (e) Plaintiff was purchasing Bitcoin-mining hardware that could be removed from Defendants' so-called "data centers" with the payment of $1, plus shipping and handling; and (f) Plaintiff could remove or "cash out" his mined Bitcoin from his virtual wallet any time.

207.    Defendants knew that the Misrepresentations were materially false when made and intended that Plaintiff rely on them.

208.    Plaintiff and Class members justifiably and reasonably relied on Defendants' Misrepresentations by entering into the Contract with VBit and Advanced Mining.

209.    Defendants' Conduct was wanton and willful, and committed with actual malice.

210.    As a direct and proximate consequence of Defendants' Misrepresentations, Plaintiff and Class members have suffered an actual loss and is entitled to an award of punitive damages in addition to compensatory damages.

## COUNT IV
### Civil Conspiracy
### (Against All Defendants)

211.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

212.    Defendants conspired to and did participate in the fraudulent scheme to defraud VBit and Advanced Mining's customers by making false statements of fact about the quality and nature of the products sold by VBit and Advanced Mining.

213.    Defendants conspired to and did conceal the true nature of the products and services sold by VBit and Advanced Mining and had the power to and did direct Advanced Mining and VBit's actions with regard to the products and services they offered.

41

214.    As a direct and proximate consequence of Defendants' conspiracy, Plaintiff and Class members suffered actual damages and are entitled to an award of punitive damages in addition to compensatory damages.

## COUNT V
### Conversion
### (Against All Defendants)

215.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

216.    Defendants have converted and/or misappropriated funds belonging to Plaintiff and the members of the Class.

217.    Defendants have frozen the virtual wallets of their customers worth millions of dollars in Bitcoin.

218.    To the extent Defendants actually purchased Bitcoin mining equipment in exchange for the money paid by Plaintiff and the members of the Class, Defendants have converted that equipment by refusing to return it.

219.    To the extent Defendants did not purchase Bitcoin mining equipment on behalf of Plaintiff and members of the Class, they had no authority to collect money or Bitcoin from Plaintiff and members of the Class in return for equipment and hosting services they did not and/or never intended to provide.

220.    Defendants converted and misappropriated the funds and/or equipment of Plaintiff and members of the Class without their consent.

221.    The conversion and misappropriation of these funds constitute a Ponzi scheme by Defendants. Such scheme is illegal, unjustified, outrageous, and intentional.

222.     As a result of Defendants' Ponzi scheme, Plaintiff and the Class suffered actual damages.

### COUNT VI
**Delaware Uniform Deceptive Trade Practices Act - 6 DE Code § 2531 *et seq.***
**Delaware Consumer Fraud Act – 6 DE Code § 2511 *et seq.***
**(Against All Defendants)**

223.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

224.     Defendants' agreements purport to be governed by the law of Delaware.

225.     As set forth more fully herein, Defendants made materially false misrepresentations to Plaintiff and Class members.

226.     Defendants intended that such misrepresentations were relied on related to the purported lease or sale of Bitcoin mining hardware.

227.     These deceptions, frauds, false promises, misrepresentations, and/or omissions of material facts are unlawful practices under the Delaware Consumer Fraud Act, 6 DE Code § 2513.

228.     These materially false misrepresentations are unlawful deceptive trade practices under the Delaware Uniform Deceptive Trade Practices Act, 6 DE Code § 2532.

229.     Among other violations of this act, the illegal conduct of Defendants as further described above, includes:

a.     Representing that goods or services have characteristics, benefits, or quantities that they did not have, § 2532(a)(5);

b.     Advertising goods or services with intent not to sell them as advertised, § 2532(a)(9);

    c.    Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity, § 2532(a)(10);

    d.    Engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding, § 2532(a)(12);

230.    Plaintiff has suffered an ascertainable loss as a result of Defendants' unlawful practices.

231.    Plaintiff and Class members are entitled to treble damages and attorneys' fees and costs for this violation.

**COUNT VII**
**Pennsylvania UTPCPL – 73 P.S. § 201 _et seq._**
**(Against All Defendants)**

232.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

233.    Defendants have their principal place of business in Philadelphia, Pennsylvania and are subject to the Unfair Trade Practices and Consumer Protection Law of the Commonwealth of Pennsylvania.

234.    Plaintiff and Class members have purchased or leased goods or services for personal purposes from the Defendants.

235.    Plaintiff and Class members have suffered ascertainable loss of the money they paid to Defendants.

236.    The monetary losses suffered by Plaintiff and Class members are directly attributable to methods, acts, or practices declared unlawful by 73 P.S. § 201-3 and § 201-2(4)(i)-(xxi).

237.    Among other violations of this act, the illegal conduct of Defendants as further described above, includes:

    a.    Representing that goods or services have characteristics, benefits, or quantities that they did not have, § 201-2(4)(v);

    b.    Advertising goods or services with intent not to sell them as advertised, § 201-2(4)(ix);

    c.    Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity, § 201-2(4)(x); and

    d.    Promoting or engaging in a Ponzi scheme where a person gives consideration for the opportunity to receive compensation that is derived primarily from the introduction of other persons into the plan or operation, § 201-2(4)(xiii).

238.    Plaintiff and Class members are entitled to treble damages and attorneys' fees and costs for this violation.

<u>COUNT VIII</u>
**Breach of Contract**
**(Against Entity Defendants)**

239.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

240.    Entity Defendants offered, and Plaintiff and the Class accepted and gave consideration for, the purported goods and services described in the Contract.

241.    Entity Defendants have breached their contractual obligations to Plaintiff by failing to provide the promised individualized physical mining equipment and hosting services.

242.    Entity Defendants have also breached their contractual obligations by preventing Plaintiff from freely withdrawing his mined Bitcoin from his virtual wallet.

243.    As a result of their breaches, Defendants have caused Plaintiff and the Class to suffer damages.

## COUNT IX
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Entity Defendants)

244.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

245.    The covenant of good faith and fair dealing is implied in every contract governed by Delaware law.

246.    The covenant requires that the parties to a contract refrain from arbitrary or unreasonable conduct that would prevent the other party to the contract from receiving the fruits of the contract.

247.    VBit and Advanced Mining have taken actions to prevent Plaintiff from receiving the benefits of the Contract in the form of mined Bitcoin and the individualized computer equipment.

248.    VBit and Advanced Mining have taken advantage of their position to control implementation of the Contract's terms by freezing Plaintiff's virtual wallet.

249.    As a result of their breaches, Defendants have caused Plaintiff and the Class to suffer damages.

## COUNT X
### Negligent Misrepresentation
### (Against All Defendants)

250.     Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

251.     Defendants had a pecuniary duty to provide accurate information to their customers.

252.     Defendants supplied false information by representing that they would be providing computing hardware and services related to Bitcoin mining when they did not in fact supply such services.

253.     Defendants failed to exercise reasonable care in communicating what they would actually be providing to Plaintiff.

254.     Plaintiff and Class members suffered a pecuniary loss caused by justifiable reliance on this information when they paid Defendants for the services that were never rendered.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.     That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed Lead Class Counsel;

B.     That the Court award Plaintiff and the Class compensatory and punitive damages, including trebled damages under RICO, the Delaware CFA and UDTPA, and the Pennsylvania UTPCPL, and against Defendants for violations of federal statutory

law, Delaware statutory law, Pennsylvania statutory law, and the common law of Delaware;

C.    That the Court hold Defendants jointly and severally liable for the conduct alleged herein;

D.    That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

E.    That the Court direct such further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

**MCCANN DILLON JAFFE & LAMB, LLC**

Dated: December 6, 2022

BY:    /s/ *Michael P. Minuti*
　　　　Michael P. Minuti, Esq. (#6311)
　　　　**McCann Dillon Jaffe & Lamb, LLC**
　　　　300 Delaware Avenue
　　　　Suite 805
　　　　Wilmington, DE 19801
　　　　P: (302) 888-1221
　　　　F: (302) 888-1332
　　　　mminuti@mccanninjurylaw.com
　　　　*Attorney for Plaintiff(s)*
　　　　*- Local Delaware Counsel*

Patrick Howard*
**SALTZ MONGELUZZI**
**& BENDESKY, PC**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 575-3895
phoward@smbb.com

Jeffrey J. Corrigan*
Jeffrey L. Spector*

Cary Zhang*
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
Email:  jcorrigan@srkattorneys.com

*pro hac vice applications to be filed.*